NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

BANCROFT MANUFACTURING COM-
PANY, INC., Croft Aluminum Compa-
ny, Inc., et al., Respondents.

Nos. 74–3052, 74–3101.

United States Court of Appeals,
Fifth Circuit.
Unit A

Jan. 30, 1981.
Rehearings Denied Feb. 23 and
March 17, 1981.

Elliott Moore, Deputy Assoc. Gen. Coun-
sel, Paul J. Spielberg, Atty., N.L.R.B.,
Washington, D.C., Paul Elkind, Asst. Gen.
Counsel, Peter Ames Eveleth, Deputy Asst.
Gen. Counsel, for Contempt Litigation, N.L.
R.B., Washington, D.C., for petitioner.

W. Kerby Bowling, Yelverton Cowherd,
Memphis, Tenn., for respondents.

Before AINSWORTH, Circuit Judge, KUNZIG, Judge,* and RANDALL, Circuit Judge.

AINSWORTH, Circuit Judge:

This case arises out of the long and troubled attempts of Croft Metals, Inc.,[1] and the Southern Council of Industrial Workers, United Brotherhood of Carpenters and Joiners of America, AFL–CIO, to negotiate a collective bargaining agreement covering the employees at the Company's McComb, Magnolia and Osyka, Mississippi, plants. The Union won a representation election held on July 1, 1971. Three years later, the National Labor Relations Board in two separate proceedings found that the Company had refused to bargain with the Union and ordered it to cease and desist from that refusal. 210 NLRB 1007 and 210 NLRB 1019 (1974). This court enforced the Board's orders in 1975, noting that it was "a close case," with misconduct on the part of the Union as well as the Company. *N.L. R.B. v. Bancroft Manufacturing Co.*, 516 F.2d 436, 439 (5th Cir. 1975), *cert. denied* 424 U.S. 914, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976).[2] In May 1977, the Board once again brought the matter to this court, charging that the Company had defied the 1975 orders and should be held in civil contempt. That dispute was settled by a consent order stipulated to by the Board and the Company and dated January 13, 1978. In June 1978, the Board charged that the Company had failed to abide by the 1978 consent order, and this court referred the matter to a Special Master for consideration.[3] We now have the Master's report and proposed order before us for decision.

The Master's report comprehensively discusses eleven major issues, most of them factual. First, he found that the Company had violated the 1978 consent order by failing to reinstate the practice of paying Christmas bonuses. The consent order required that the Company, "if requested by the Union, [reinstate] its former practice of paying Christmas bonuses to leadmen and leadwomen, subject to further negotiations about its discontinuance." The Master found that the Union had requested reinstatement of the bonuses for 1978 and that the Company did not reinstate the practice for that year. The Master also found that the Company unilaterally changed the morning break time of certain employees in violation of the consent order's prohibition against "making unilateral changes in wages, hours and working conditions, and other terms and conditions of employment." In so finding, the Master accepted the testimony of employees that the change came in April 1978, after the consent order was issued, rather than earlier. The Master additionally concluded that the Company violated the requirement of the consent order that it rescind the merit evaluation system unilaterally instituted in November 1978. He found that the Company had initially agreed to rescind the new system but that it did not reinstate the old system and took several months to institute the system the parties later agreed upon. Finally, the Master found that the Company violated the consent order by refusing to grant merit increases to unfair labor practice strikers upon their reinstatement. The Company had argued that the merit increases need not be given to the employees because they were not present to be evaluated at the time the merit increases were

---

* Judge of the United States Court of Claims, sitting by designation.

1. In addition to Croft Metals, Inc., the respondents in this proceeding include several Croft subsidiaries and two corporate officers.

2. The case reported at 516 F.2d 436 enforced the Board's order reported at 210 NLRB 1007. This court also enforced the Board's other order (210 NLRB 1019) in an unreported decree No. 74–3101 (May 7, 1975).

3. Special Masters in cases like this one are selected from a list supplied by the Chief Hearing Examiner of the Civil Service Commission. The persons on the list are administrative law judges not connected with the NLRB. Judge Cecil L. Cutler, Jr., the Special Master in this case, is an Administrative Law Judge of the Occupational Safety and Health Review Commission.

given. The Master, noting that over 99 per cent of the nonstriking employees had received a merit increase during the period of the strike, concluded that the strikers would have received an increase but for the strike, and were therefore entitled to the merit increase upon reinstatement. The Master also found, contrary to the Board's allegations, that the Company had not violated the order by refusing to bargain over job classifications, by failing to pay employees for an extra day off preceding a holiday, by failing promptly to mail out notices required by the order, and by transferring work to other plants. After thoroughly examining the record, the report and the briefs, we hold that the Master's resolution of these factual issues was not clearly erroneous and we therefore adopt his findings. See *N.L.R.B. v. J. P. Stevens & Co., Inc., Gulistan Div.*, 538 F.2d 1152, 1160 (5th Cir. 1976).

The other two issues discussed by the Master—whether the Company refused to bargain after March 10, 1978, and whether two officers of the Company should be held in contempt—are primarily legal determinations, so the clearly erroneous standard does not apply. *N.L.R.B. v. Alterman Transport Lines, Inc.*, 587 F.2d 212, 220 (5th Cir. 1979). Nevertheless, we agree with and adopt the Master's findings of fact and conclusions of law in this regard. The Company does not deny that it refused to bargain after March 10, 1978, but contends that its refusal was justified since the parties had reached an impasse. " 'Impasse' within the meaning of the federal labor laws presupposes a reasonable effort at good–faith bargaining which, despite noble intentions, does not conclude in an agreement between the parties." *N.L.R.B. v. Big Three Industries, Inc.*, 497 F.2d 43, 48 (5th Cir. 1974). A determination of whether an impasse exists requires examination of what kept the parties from reaching an

agreement. The Master found that the Company and the Union would have reached an agreement if they had resolved one final issue, the arbitrability of merit increase determinations. We cannot as a matter of law hold that the Company's refusal to concede on this one issue constituted bad–faith bargaining, and we therefore agree that an impasse existed. See *N.L.R.B. v. Crockett–Bradley, Inc.*, 598 F.2d 971, 975 (5th Cir. 1979). The Master is also clearly correct in finding that Joseph Bancroft, Chairman of the Board of the Company, and Jean Kuyrkendall, the Executive Vice President, should be held in contempt along with the Company; neither the Board nor the Company contests the Master's finding in this regard.

Finally, the Master recommends that we not assess costs and attorney's fees against the Company "in view of the finding of no liability as to five of the charges ...." Master's report at 70. Although the Board is correct in its assertion that the denial of some of its charges does not require us to deny assessment of costs against the Company, we agree with the Master that in a case like this one where all parties, including the Board, have engaged in questionable tactics,[4] and the costs have been increased by delays which occurred through the fault of neither party, it is best to let each party bear its own costs.

It is therefore ORDERED AND ADJUDGED that respondents, Croft Metals, Inc., and its subsidiaries, Bancroft Manufacturing Company, Inc., Croft Aluminum Company, Inc., Croft Ladders, Inc., Croft Metal Products, Inc., and Lemco Metal Products, Inc., and Joseph Bancroft and Jean Kuyrkendall, are in civil contempt for having violated the order of this court of January 13, 1978. We hereby adopt and incorporate by reference the Special Master's Recommended Final Order set out in the Appendix.

---

4. The Master found that "the Board's attitudes and tactics have not always been characterized by impartiality and fairness, and its demands upon the Company, at times, could be termed as 'nit–picking.' " Master's report at 67. He also found that the "overall expenses in this case were unnecessarily increased due to some lack of harmony and cooperation existing between counsel for the parties as well as unanticipated delays which occurred through no fault of either party." Master's report at 71.

## APPENDIX

It is ORDERED that respondents shall purge themselves of civil contempt by:

### I

(a) Fully complying with and obeying this Court's judgments of May 7, 1975, and August 14, 1975, and order of January 13, 1978, and not in any way by action or inaction, committing, engaging in, inducing, encouraging, permitting, or condoning any violation of the said judgments and order;

(b) Immediately reinstating the former practice of paying Christmas bonuses to leadmen and leadwomen, as previously requested by the Union, and making whole all leadmen and leadwomen for any monetary losses they may have suffered by reason of the Company's failure and refusal to reinstate the 1977 or subsequent Christmas bonuses, together with interest thereon, the amounts, unless agreed upon, to be fixed by the Board, subject to further review by the Court; to continue the practice of paying Christmas bonuses subject to further negotiations about its discontinuance;

(c) If requested by the Union, immediately reinstating the former morning break schedule for glass department employees at its Magnolia facility which existed prior to the April 1978 unilateral change in schedules;

(d) Immediately restoring the *status quo ante* by resuming operations on line one of the Series 20 Department of the Magnolia facility which it unilaterally shut down on about April 14, 1978, and the two second shift lines of the Series 800 Department of said facility which it unilaterally shut down in about April and May 1978; immediately offering to reinstate to their former positions all employees whom it unilaterally transferred to other jobs and departments as a result of the aforesaid shutdowns and the unilateral shutdown of the first shift in the Series 1400 Department from mid–April to about early May 1978, without prejudice to their seniority and other rights and privileges; making all of the aforesaid employees whole for any loss of earnings suffered by reason of their transfers, together with interest thereon, the amounts, unless agreed upon, to be fixed by the Board, subject to further review by the Court;

(e) Immediately rescinding the oral merit performance evaluation system or any other employee evaluation system unilaterally instituted since January 13, 1978, and immediately instituting the evaluation system agreed upon by the parties during bargaining on about March 9, 1978; and making all employees whole for any loss of earnings suffered by reason of the Company's unilateral actions with respect to employee evaluations or its reneging on its agreement to implement a new evaluation system together with interest thereon, the amounts, unless agreed upon, to be fixed by the Board, subject to review by the Court;

(f) Immediately, upon the Union's request, returning to the process of bargaining collectively in good faith with the Union as the exclusive representative of the Company's employees in the appropriate unit until there is full agreement or it is clear that a bona fide impasse has been reached, and if any such understanding is reached, embodying such understanding and all the terms thereof in a signed agreement, recognition not to be withdrawn from the Union without further order of the Court;

(g) Immediately, upon the Union's request, proceeding with officials of the Union to set an initial bargaining date, not to exceed fifteen (15) days from the entry of the adjudication, and thereafter proceeding to bargain for no less than two consecutive days per week during regular business hours until all contract proposals have been considered and action taken in relation thereto;

(h) Filing sworn reports signed by the Company and Joseph Bancroft and Jean Kuyrkendall, and by the Union representatives with the said Regional Director, every thirty (30) days showing in detail the nature and course of bargaining in summary form and appending thereto any minutes, proposals, counterproposals, and any written communications between the Union and the Company with respect to such bargaining. If

either party has exceptions to the contents of the joint summary, separate additional reports setting forth differences may be filed;

(i) Treating all those employees who went on strike on January 16, 1977, or thereafter, as unfair labor practice strikers, and according such employees all the rights to which unfair labor practice strikers are entitled, including credit for a ten cent ($.10) merit wage increase found to have been awarded non–strikers during the period of the strike; and making said former strikers whole for any loss of earnings suffered by reason of the Company's failure to accord them all the rights to which unfair labor practice strikers are entitled, including its denial of credit for a merit increase of ten cents ($.10) per hour together with interest thereon;

(j) Refraining from making unilateral changes in wages, hours, and working conditions including layoffs and transfers of employees and transfers of bargaining unit work, work breaks, and other terms and conditions of employment; failing to give the Union adequate notice of such contemplated changes and failing to bargain in good faith with respect thereto;

(k) Refraining from in any other manner interfering with, restraining, or coercing employees in the exercise of their rights guaranteed in Section 7 of the National Labor Relations Act;

(*l*) Immediately posting in conspicuous places in its McComb, Mississippi, offices, and all places where notices to employees are customarily posted at its Magnolia, Mississippi, facility, and at all of its other manufacturing facilities, for a period of sixty (60) consecutive days, copies of this contempt adjudication and of an appropriate notice in the form to be supplied by the Board and signed by Joseph Bancroft, individually and as chairman of the board of directors and chief executive officer of the Company, and by Jean Kuyrkendall, individually and as executive vice president of the Company, which states that the Company, Joseph Bancroft, and Jean Kuyrkendall have been adjudicated in civil contempt of

this Court for violating and disobeying and failing and refusing to comply with this Court's judgments and subsequent order, and that the Company, Joseph Bancroft, and Jean Kuyrkendall will forthwith undertake the action ordered in purgation in the earlier order and this contempt adjudication, said notices, together with a copy of the order and this contempt adjudication, to be maintained in clearly legible condition through such posting period, and insuring that they are not altered, defaced, or covered by any other material;

(m) Immediately duplicating at its own expense, signing by Joseph Bancroft or Jean Kuyrkendall, and mailing copies of the notice and the contempt adjudication to each of its present employees and to each of its former employees employed since the entry of the Court's order of January 13, 1978, and providing to the Director of the Fifteenth Regional Office of the Board a list of the names and addresses of all employees and former employees to whom said documents were mailed, together with proof of mailing;

(n) Requiring each officer, director, and supervisor of the Company, and any individual or agent authorized by the Company to negotiate on its behalf, to signify in writing, under oath, that he or she has been furnished with a copy of the contempt adjudication and of the Court's judgments of May 7 and August 14, 1975, and order of January 13, 1978; and that he or she has read and understands such decrees, and that he or she will conduct himself or herself in all respects consistent with the terms thereof and will in no way by action or inaction, engage in, induce, encourage, permit, or condone any violation of these decrees of the Court. Copies of the aforesaid acknowledgments shall be furnished by the Company to the Regional Director of the Board's Fifteenth Regional Office;

(*o*) Filing a sworn statement with the Clerk of this court and a copy thereof with the Director of the said Regional Office within fifteen (15) days after the entry of the adjudication in contempt and again at the end of the posting period showing what

steps have been taken by the Company and Joseph Bancroft and Jean Kuyrkendall to comply with the Court's directions;

(p) Preserving and making available to the Board for inspection and copying, all books and records necessary or useful in determining whether there has been compliance with the provisions of the purgation order, and necessary or useful to analyze the amounts of backpay due employees or former employees thereunder.

## II

The Company shall pay the amount of fifty thousand dollars ($50,000) for its past non–compliance with the provisions of the Court's Order of January 13, 1978, of which it has been found in contempt.

## III

To assure a cessation of the violations of the Court's judgments of May 7, 1975, and August 14, 1975, and to assure compliance with the Court's order of January 13, 1978, and with this contempt adjudication, this Court hereby imposes a daily fine for non–compliance against the Company in the amount of two thousand five hundred dollars ($2,500) and in the amount of five hundred dollars ($500) against Joseph Bancroft and Jean Kuyrkendall and any other individual who, with knowledge of this order, acts in concert and participation with the Company, Joseph Bancroft and Jean Kuyrkendall to violate this order. The assessment of such fines shall commence 15 days from the entry of the foregoing order and continue so long as the respondents fail to comply with any of the provisions of this order.

## IV

Upon the failure of respondents to purge themselves of civil contempt, the Court reserves jurisdiction to issue attachment against them and any officer or agent of the Company responsible therefor, as well as to substantially increase the amount of compliance fines, and the Court shall take other and further action, and grant such other and further relief as may be adjudged just, reasonable, and necessary to assure compliance with the Court's previous judgments and order, and as this proceeding in civil contempt may require.